IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHANIE L. MASON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | No. 3:20-cv-2061-N-BN |
| | § | |
| THE CITY OF MANSFIELD, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
<u>UNITED STATES MAGISTRATE JUDGE</u>**

Plaintiff Stephanie L. Mason, through counsel, filed a second amended complaint against Defendant City of Mansfield under 42 U.S.C. § 1983 alleging "unconstitutional harassment, up to and including wrongful search and seizure in violation of the Fourth Amendment to the Constitution, as applied to state and local governments through the Fourteenth Amendment to the Constitution" [Dkt. No. 37] (the SAC).

Mason filed the SAC after the Court dismissed her first amended complaint without prejudice. *See Mason v. City of Mansfield Police Dep't*, No. 3:20-cv-2061-N-BK, 2022 WL 3648640 (N.D. Tex. July 29, 2022), *rec. accepted*, 2022 WL 3650744 (N.D. Tex. Aug. 24, 2022).

The City now moves to dismiss the SAC with prejudice. *See* Dkt. No. 40. Mason responded. *See* Dkt. No. 41. And the City replied. *See* Dkt. No. 42. This lawsuit was then transferred to the undersigned United States magistrate judge for pretrial management under 28 U.S.C. § 636(b) and a standing order of reference from Chief

United States District Judge David C. Godbey. And the undersigned enters these findings of fact, conclusions of law, and recommendation that the Court should grant the motion to dismiss and dismiss this lawsuit with prejudice.

## Applicable Background

The facts as alleged in the SAC are that:

> Plaintiff lives at the High Crest House within the geographical confines of the City and served by the agencies of the City. In the High Crest House along with Plaintiff live her father, her boyfriend, and her two children.
> For years now, law enforcement officers from the Mansfield Police Department, an agency of the City of Mansfield, have harassed Plaintiff and her family, friends, and associates both at the High Crest House and elsewhere in the City for no apparent reason, despite the fact that Plaintiff has no criminal record. They have, for example, stopped her for pretextual reasons and then thoroughly searched her vehicle for a length of time far beyond that required on the basis of the offered reasons for the stop. They have followed her for extended periods of time, often offering no grounds for having done so, even pretextual. They have waited outside her home for no apparent reason. They have effectively intruded significantly upon her daily life, despite the fact that they have given no indication as to what could possibly motivate such a police presence. On information and belief, the Mansfield Police Department has had no probable cause to engage in these activities as detailed more fully and by way of example below.
> In 2017, after Plaintiff had resided at the High Crest House for decades, the Mansfield Police Department began its pattern of stopping Plaintiff and her family, friends, and associates on pretextual grounds and then using the occasion as an excuse to search the vehicle at issue in a manner and for a duration not reasonably connected to the proffered ground on the alleged basis of which the stop was made.
> On May 6, 2017, Plaintiff and her boyfriend were stopped by officers from the Mansfield Police Department purportedly because of invalid license plates and lack of insurance. However, the license plates on the vehicle were valid and there was valid insurance. From the fact that the police officers searched the vehicle at length during this traffic stop despite a purported ground for the stop which would have required no search at all, much less a lengthy one, it was clear that the police officers had stopped the vehicle for predetermined reasons having nothing to do with the baseless grounds they put forward. Only when

the officers found nothing after a thorough search did they release Plaintiff and her boyfriend to continue on their way. Even after releasing them, the police officers followed them back to the gathering they had left, thus further reinforcing the idea that the grounds for the initial traffic stop were pretextual.

On November 6, 2017, Plaintiff interacted with a Mansfield Police Commander of Patrols Internal Affairs who sat outside the High Crest House for no apparent purpose. He claimed to be doing nothing more than paperwork, but, on information and belief, given the implausibility of the idea that this officer would choose to do paperwork directly outside the High Crest House, particularly in light of subsequent police harassment activities, as described below, the police officer at issue was placing the High Crest House under observation for no legitimate reason. After all, the High Crest House is situated in an out-of-the-way location that does not serve as a logical or natural point at which law enforcement would ordinarily choose to complete unrelated paperwork. The actions of the Mansfield Police Department only two days later confirm this interpretation.

On November 8, 2017, officers of the Mansfield Police Department stopped Plaintiff's vehicle for the purported failure to display the license plate properly on the front bumper, although it was clearly visible in the front window. Multiple police officers arrived and threw the driver, a friend of Plaintiff, onto the ground. Plaintiff herself was detained sitting on the ground for a considerable length of time. The officers searched the vehicle at length, despite no such search having any justification in light of the purported basis for the stop. They found nothing more than an orange juice bottle in the drink holder, which, describing the bottle as paraphernalia, the officers then used as grounds for arresting Plaintiff and detaining her in jail, as well as towing her vehicle. As the bottle did not constitute paraphernalia at all and was, in fact, nothing more than an orange juice bottle, Plaintiff was released without charges after the Magistrate Judge excoriated the officers for their detention of Plaintiff.

While detained by the Mansfield Police Department at the local jail, Plaintiff contracted Methicillin-resistant Staphylococcus Aureus ("MRSA"), suffered unbearable pain, and had to be hospitalized for several days as a result. Her immune system was permanently compromised as a result of this MRSA infection. She has suffered other related medical complications as well.

Despite the lack of any charges against Plaintiff in connection with the November 8, 2017, arrest and despite the failure of the Mansfield Police Department to put forward any evidence of any kind justifying Plaintiff's arrest and detention, Plaintiff continued to suffer negative consequences well after the event. On November 27, 2017, a

caseworker from the Child Protective Services Division of the Texas Department of Family & Protective Services ("CPS") notified Plaintiff that she had received a call relating to an arrest involving drug paraphernalia and that, as a result, Plaintiff would have to pass a drug test. On information and belief, this call was made by the Mansfield Police Department, despite the fact that it had failed to justify its arrest and detention of Plaintiff in any way. Likewise, on November 29, 2017, a law enforcement liaison from the Texas Health and Human Services Commission who specialized in epidemiological issues notified Plaintiff that he had received a call to the effect that Plaintiff had had a sexual encounter that would require blood testing her for epidemiological purposes. This liaison returned to the High Crest House on multiple occasions in an effort to obtain blood samples. Plaintiff had had no such sexual encounter. In light of the fact that the agent from the Texas Health and Human Services Commission was a law enforcement liaison, it is a reasonable inference that the misinformation directed to him came from the Mansfield Police Department, particularly in light of the other incidents of harassment of Plaintiff by officers of that department.

On February 13, 2018, officers from the Mansfield Police Department followed Plaintiff from a Mansfield hotel at which she had attended a gathering. The police vehicle had parked in the hotel parking lot and ostensibly waited there for Plaintiff to leave. After following Plaintiff for a considerable length of time, making turns as necessary to continue following her, the police officers stopped her purportedly for failing to signal 100 feet ahead of the turn. The officers then indicated they needed to search the vehicle, although they gave no explanation for why a failure to signal appropriately could possibly give grounds for such a search. In the course of searching the vehicle, the police officers questioned Plaintiff as to why she had correspondence in her vehicle from an inmate in state jail and ultimately took that correspondence with them without permission. Meanwhile, the search took far longer than necessary, particularly in that there were no legitimate grounds warranting a search in the first place.

The very next day, on February 14, 2018, Plaintiff received a telephone call notifying her that the Mansfield Police Department was towing her car after arresting her cousin who had been driving the vehicle a block away from the High Crest House. The police officers had purportedly stopped the vehicle for failure to display the license plate on the front bumper. Plaintiff had to retrieve her vehicle from a local towing company. On information and belief, it is not customary practice for the Mansfield Police Department to arrest a driver and to tow a vehicle for such a failure to display. On information and belief, officers of the Mansfield Police Department took these actions with respect to Plaintiff's vehicle as part of a continued campaign of harassment against

her.

The day after that, on the morning of February 15, 2018, Plaintiff walked outside the High Crest House to take her son to school and saw a Mansfield Police SUV parked a house away facing the High Crest House. That same day, Mansfield police officers stopped her in her vehicle on the purported ground that she had failed to signal 100 feet ahead of a stop sign. On information and belief, this purported ground was entirely pretextual.

A few hours later, in the early morning of February 16, 2018, Plaintiff was ostensibly followed by Mansfield police officers in another vehicle for no apparent reason. On information and belief, the Mansfield police officers failed to stop Plaintiff on that occasion only because she turned onto a side street, stopped her vehicle, and turned off the lights. The police officers turned onto the same street, but did not appear to notice her parked vehicle. Plaintiff is not aware of any traffic violation or other reasonable basis for the officers to have followed her. On information and belief, the officers took these actions with respect to Plaintiff as part of a continued campaign of harassment against her.

During the summer of 2018, officers from the Mansfield Police Department made other stops of Plaintiff in her vehicle, searching the vehicle without a legitimate basis and for far longer than reasonable or appropriate.

On September 8, 2018, the Mansfield Police Department again stopped Plaintiff and her whole family in her vehicle purportedly for failing to signal 100 feet in front of a stop sign. Nevertheless, the police detained Plaintiff and her vehicle so long that a child in the car with them ended up urinating all over herself. The officers had been informed of the issue, but recommended only that the girl urinate alongside the car, which she could not do. Plaintiff disputes that she failed to signal appropriately. However, even if she did, nothing about such an event gave the police officers any legitimate ground for searching her vehicle at all, much less to search it for an extended period of time. The shocking treatment of the little girl by the Mansfield police officers made Plaintiff aware for the first time as to the degree to which the Mansfield police were coordinated in their effort to conduct searches against her and harass her generally at all costs.

On January 9, 2019, officers from the Mansfield Police Department followed Plaintiff to an interview and then back home again for no apparent or legitimate reason.

On February 20, 2019, a Mansfield police officer made statements to Plaintiff's brother about her that were damaging and humiliating, despite allowing the brother and those with him to proceed unhindered after those statements were made. The next day, on February 21, 2019, the same Mansfield police officer who had made these damaging

statements was in a Mansfield police SUV parked at the intersection by the High Crest House, apparently watching the house. Later that morning, Plaintiff's brother was detained in the neighborhood for jaywalking by Mansfield police officers and was asked by the officers about Plaintiff.

On March 28, 2019, Plaintiff was parked in her father's vehicle outside the High Crest House recording a Mansfield police officer at the nearby intersection. The officer then moved his vehicle behind hers and gave her a ticket, which was then dismissed by a magistrate.

On April 29, 2019, Plaintiff was stopped by a Mansfield police officer for purportedly a "wide right turn," upon which the Mansfield police needlessly frisked and detained an associate of Plaintiff. In the months to come, the Mansfield police continued to drive by the High Crest House, to follow Plaintiff, to take pictures of Plaintiff, and to park in the proximity of the High Crest House.

On December 19, 2019, Mansfield police officers were again parked in the proximity of the High Crest House and appeared to be discussing surveillance activities. That same night, Mansfield police officers followed Plaintiff's brother through the neighborhood.

On January 11, 2020, a Mansfield police SUV drove by and shined its lights into the house at around 2:00 a.m.

On January 14, 2020, Plaintiff met with the Mansfield chief of police to explain the apparent ongoing pattern of harassment. She was unable to obtain any meaningful response from him and the harassment continued unabated. This failure to take action on Plaintiff's behalf constitutes, at a minimum, acquiescence in the pattern of harassment, thus adopting and ratifying it as an official policy and custom. Moreover, this failure gives rise to the reasonable inference that the pattern of harassment arose from official policy and custom, directed by the chief of police or a similar policymaker, from the start. This reasonable inference is further reinforced by the fact that Plaintiff sought to make contact with Internal Affairs in the Mansfield Police Department through substantial written correspondence in 2019 and finally managed to speak with an officer from Internal Affairs on January 7, 2020, and received no meaningful response or follow-up from this discussion, again giving rise to the reasonable inference that the pattern of harassment arose from a coordinated policy and custom within the department which, therefore, Internal Affairs had no viable mechanism to address. Moreover, Plaintiff had sent correspondence to the Mayor of Mansfield and to Mansfield city council members as early as 2019 as well, demonstrating that these policy making members of the Mansfield city government at least acquiesced in the complained of conduct.

On January 19, 2020, Plaintiff was arrested for a warrant from a different municipality. While she was detained, the Mansfield police

searched and damaged the vehicle she had been traveling in, despite the fact that nothing about the arrest suggested the need or appropriateness of any kind of search, much less one so invasive as to lead to damage of the vehicle.

Between May 2020 and August 2020, the Mansfield police stepped up their harassment once again, parking near Plaintiff's house in a manner suggesting groundless surveillance (May 7, June 19, August 2) and at other times following her without apparent purpose (June 6). These incidents slowed down after Plaintiff filed her Original Complaint in this litigation on August 4, 2020. However, they did not cease completely, as evidenced by apparent groundless surveillance of the house again by Mansfield police officers on June 8, 2021, and June 13, 2021.

On information and belief, the High Crest House is not in a natural location for police officers to take care of paperwork, to conduct appropriate community patrols, or to address any appropriate police matters. On information and belief, on the occasions detailed above, Mansfield police officers had no legitimate reason to engage in the described activities and did so for purposes of harassment. No Mansfield officials or officers have ever provided any reasonable account of the activities articulated above, even when Plaintiff brought those activities to the attention of Internal Affairs and the Chief of Police and other governmental officials, as described above.

Plaintiff has sought relief from this law enforcement harassment through discussions with police officials and by repeatedly demonstrating in municipal court the lack of probable cause for various police actions. None of her efforts in this regard have borne fruit, and the pattern of harassment has continued. Plaintiff thus has no alternative but to seek the intervention of this Court. She asks this Court to issue a preliminary injunction enjoining Defendant from refusing to cease its pattern of harassment against her and from refusing to take only those enforcement actions that are reasonable under the circumstances and authorized under the Constitution and laws of the United States and the State of Texas. She further seeks compensatory damages, damages for emotional distress, court costs, and reasonable attorneys' fees.

Dkt. No. 15, ¶¶ 9-34.

## Legal Standards

In deciding a motion to dismiss for failure to state a claim upon which relief may be granted under Rule 12(b)(6), the Court "accepts all well-pleaded facts as true,

viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205-06 (5th Cir. 2007).

Such a motion is therefore "not meant to resolve disputed facts or test the merits of a lawsuit" and "instead must show that, even in the plaintiff's best-case scenario, the complaint does not state a plausible case for relief." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 581 (5th Cir. 2020).

Even so, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must plead those facts with enough specificity "to raise a right to relief above the speculative level," *id.* at 555.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* And "[a] claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679); *see also Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) ("Where the well-pleaded facts of a complaint do not permit a court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" (quoting *Iqbal*, 556 U.S. at 678

(quoting, in turn, FED. R. CIV. P. 8(a)(2)))).

Federal Rule of Civil Procedure 8(a)(2) does not mandate detailed factual allegations, but it does require that a plaintiff allege more than labels and conclusions. And, while a court must accept a plaintiff's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Consequently, a threadbare or formulaic recitation of the elements of a cause of action, supported by mere conclusory statements, will not suffice. *See id.*; *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023) ("[T]he court does not 'presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement.'" (quoting *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1162-63 (5th Cir. 2021))).

So, "to survive a motion to dismiss" under *Twombly* and *Iqbal*, plaintiffs must "plead facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014) (per curiam) (citing FED. R. CIV. P. 8(a)(2)-(3), (d)(1), (e)); *see also Inclusive Communities*, 920 F.2d at 899 ("'Determining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" (quoting *Iqbal*, 556 U.S. at 679; citation omitted)).

These general pleading standards apply to a claim against a municipality. *See*

*also Hutcheson v. Dall. Cnty., Tex.*, 994 F.3d 477, 482 (5th Cir. 2021) ("There is no heightened pleading standard for § 1983 claims against municipalities. To survive a motion to dismiss, the complaint need not contain detailed factual allegations but still must state sufficient facts to establish a plausible claim on its face." (citing *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 622 (5th Cir. 2018)))).

Because "[a] person may sue a municipality that violates his or her constitutional rights [only] 'under color of any statute, ordinance, regulation, custom, or usage,'" *id.* (quoting Section 1983; citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)), a plaintiff alleging a *Monell* claim "has two burdens: to [plausibly allege] (1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the violation," *Sanchez v. Young Cnty., Tex.*, 956 F.3d 785, 791 (5th Cir. 2020) (citing *Monell*, 436 U.S. at 694).

Accordingly, "[i]n municipal-liability cases," the threshold question "is whether the complained-of 'act may fairly be said to represent official policy.'" *Id.* at 792-93 (cleaned up; quoting *Monell*, 436 U.S. at 694); *see also Hutcheson*, 994 F.3d at 483 (rejecting the argument that a district court errs by dismissing a *Monell* claim without first analyzing the underlying constitutional violation).

And a plaintiff may proceed on a *Monell* claim only by

identify[ing] "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom)." *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002) (cleaned up). Municipalities are not liable "on the theory of respondeat superior" and are "almost never liable for an isolated unconstitutional act on the part of an employee." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009).

*Hutcheson*, 994 F.3d at 482; *see also Brown v. Tarrant Cnty., Tex.*, 985 F.3d 489, 497 & n.11 (5th Cir. 2021) (noting that where a plaintiff's claim fails as to one prong, a court "need not consider whether [his] claim also fails the other two *Monell* prongs" (citing *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168-69 (5th Cir. 2010))).

"Official policy can arise in various forms. It usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 579 (5th Cir. 2001) (quoting, in turn, *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984) (per curiam) (en banc))); *see also Brown*, 985 F.3d at 497 ("An 'official policy' may take two forms – either a 'policy statement formally announced by an official policymaker' or a 'persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'" (quoting *Zarnow*, 614 F.3d at 168-69)).

"Under the second requirement, a plaintiff must show '[a]ctual or constructive knowledge of [a] custom' that is 'attributable to the governing body of the municipality or to an official to whom that body ha[s] delegated policy-making authority.'" *Allen v. Hays*, ___ F.4th ____, No. 21-20337, 2023 WL 2942982, at *8 (5th Cir. Apr. 14, 2023) (quoting *Webster*, 735 F.2d at 841). And "a plaintiff must allege 'moving force' causation by showing first, 'that the municipal action was taken with

the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.'" *Id.* (quoting *Valle v. City of Hous.*, 613 F.3d 536, 542 (5th Cir. 2010)).

"[T]he failure to provide proper training may fairly be said to represent a policy for which the [municipality] is responsible, and for which [it] may be held liable if it actually causes injury." *Shumpert v. City of Tupelo*, 905 F.3d 310, 317 (5th Cir. 2019) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). And, although an alleged failure to train (or to supervise) "is a separate theory of municipal liability," "the same standard applies both to a failure to train [or to supervise] claim and to a municipal liability claim." *Pinedo v. City of Dall., Tex.*, No. 3:14-cv-958-D, 2015 WL 5021393, at *9 (N.D. Tex. Aug. 25, 2015) (citations omitted).

"The ratification theory provides another way of holding a city liable under § 1983" but only "if the policymaker approves a subordinate's decision and the basis for it, as this 'ratification' renders the subordinate's decision a final decision by the policymaker." *Allen*, 2023 WL 2942982, at *8 (footnote omitted). But "a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Peterson*, 588 F.3d at 849 (citation omitted).

This theory is also "limited to 'extreme factual situations,'" such that conduct may be unconstitutional but "not sufficiently extreme to qualify for a finding of ratification." *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 395-96 (5th Cir. 2017) (citations omitted)).

Most importantly, regardless the theory of municipal liability, "[t]o proceed

beyond the pleading stage, a complaint's 'description of a policy or custom and its relationship to the underlying constitutional violation ... cannot be conclusory; it must contain specific facts.'" *Peña v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018) (quoting *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997); footnote omitted); *see also Pinedo v. City of Dall., Tex.*, No. 3:14-cv-958-D, 2015 WL 5021393, at *5 (N.D. Tex. Aug. 25, 2015) ("To establish a custom, a plaintiff must demonstrate (and, at the pleading stage, must plausibly plead) 'a pattern of abuses that transcends the error made in a single case.'" (quoting *Piotrowski*, 237 F.3d at 582)).

## Analysis

In response to the City's chief arguments for dismissal of this lawsuit with prejudice, Mason asserts (1) that her suit, filed in August 2020, is timely because it was not until September 2018 that she became "aware for the first time as to the degree to which the Mansfield police were coordinated in their effort to conduct searches against her and harass her generally at all costs," Dkt. No. 37, ¶ 23, thus her Section 1983 claim did not accrue until then, and (2) that the well-pled facts of the SAC permit the Court to infer both that the Constitution was violated and that, consistent with the requirements of *Monell*, the City may be sued for this violation.

The undersigned disagrees. Even if Mason's claims are timely, and even if the SAC contains enough factual matter that must be accepted as true to plead a plausible Fourth Amendment violation, Mason still fails to plausibly allege that a policy of the City was the moving force behind the alleged constitutional violation.

First, Mason does not "link" the alleged violation to "a 'policy statement formally announced by an official policymaker.'" *Brown*, 985 F.3d at 497 (quoting *Zarnow*, 614 F.3d at 168-69). She nevertheless may allege an official policy based on "a 'persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'" *Id.* (quoting *Zarnow*, 614 F.3d at 169).

But, as she admits, Mason's allegation of a widespread practice is a practice isolated to her. *See, e.g.*, Dkt. No. 41 at 22 ("Plaintiff does not include allegations about friends, family, and associates for the purpose of seeking redress for injuries which they suffered. Rather, she includes such allegations as further support for her claims that Defendant is engaged in a pattern of wrongdoing against her."). Such allegations, "limited to the events surrounding [Mason]," cannot constitute "an allegation of a *de facto* policy of [unconstitutional harassment] by the [City]." *Culbertson v. Lykos*, 790 F.3d 608, 629 (5th Cir. 2015); *see id.* at 628 ("Here, the plaintiffs allege there was a retaliatory campaign against them and a retaliatory investigation against the grand jury and its prosecutors, all arising from the same predicate events. The retaliatory campaign against them was publicly known, but they offered no evidence that similar retaliation had victimized others. There was, in other words, no allegation of a 'widespread practice' of retaliation that is 'so common and well settled' as to constitute the policy of Harris County." (quoting *Webster*, 735 F.2d at 853)); *see also Zinter v. Salvaggio*, 610 F. Supp. 3d 919, 961 (W.D. Tex. 2022)

("[P]laintiffs' alleged 'identify, seize, and arrest' policy falls far short of demonstrating the type of persistent, widespread violations of constitutional rights giving rise to municipal liability. Plaintiffs ask the Court to infer this unwritten policy based on the arrests and detentions in May and June 2018.... [But t]he various arrests and seizures in May and June 2018 do not show a pattern of constitutional violations affecting the whole of Leon Valley." (citations omitted; emphasis added)).

Nor can the single-incident exception apply based on Mason's allegations, where there is no factual basis to infer that any officer who allegedly harassed her was a policymaker for the City. *See Arevalo v. City of Farmers Branch, Tex.*, No. 3:16-cv-1540-D, 2017 WL 5569841, at *4 (N.D. Tex. Nov. 20, 2017) ("A single incident unaccompanied by supporting history will likely be an inadequate basis for inferring such a custom or usage unless the actor or actors involved had been given official policy-making authority." (quoting *Renfro v. City of Kaufman*, 27 F. Supp. 2d 715, 717 (N.D. Tex. 1998) (citing, in turn, *Worsham v. City of Pasadena*, 881 F.2d 1336,1339-40 (5th Cir. 1989)))).

But, even if the Court were to find that Mason has provided enough factual content to plausibly allege a policy, *cf. Balle v. Nueces Cnty., Tex.*, 952 F.3d 552, 559 (5th Cir. 2017) ("[P]leadings are sufficient when they make specific factual allegations that allow a court to reasonably infer that a policy or practice exists and that the alleged policy or practice was the moving force behind municipal employees' [alleged constitutional violations]." (citing *Colle v. Brazos Cnty.*, 981 F.2d 237, 245 (5th Cir. 1993))), Mason's claim against the City fails at *Monell*'s second prong.

Examining this requirement – a policymaker who can be charged with actual or constructive knowledge of the identified official policy or custom – a complaint need "not specifically identify [the municipality's] policymaker," *Balle*, 952 F.3d at 559, because that identity "is a question of state law," and "courts should not grant motions to dismiss § 1983 cases 'for imperfect statement of the legal theory,'" *Groden v. City of Dall., Tex.*, 826 F.3d 280, 284-85 (5th Cir. 2016) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988), then quoting *Johnson*, 574 U.S. at 11).

Instead, the well-pleaded facts must "establish that the challenged policy was promulgated or ratified by the city's policymaker." *Id.* at 285; *see also Longoria Next Friend of M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 271 (5th Cir. 2019) ("Because the 'specific identity of the policymaker is a legal question that need not be pled,' plaintiffs can state a claim for municipal liability as long as they plead sufficient facts to allow the court to reasonably infer that the [policymaker] either adopted a policy that caused [their] injury or delegated to a subordinate officer the authority to adopt such a policy. In other words, plaintiffs must plead facts that sufficiently connect the policymaker ... to the allegedly unconstitutional policy." (citing *Groden*, 826 F.3d at 284, 286)).

Mason primarily pleads facts to connect the City's Chief of Police to the widespread practice isolated to her that she alleges amounts to an official policy of the City. But, while she identifies an alleged policymaker, the Chief, Mason fails to offer factual material from which the Court may infer that the Chief possessed final policymaking authority.

First, "[t]here is a fundamental difference between decision makers and policymakers," such that "'[d]iscretion to exercise a particular function does not necessarily entail final policymaking authority over that function.'" *Martinez v. City of N. Richland Hills*, 846 F. App'x 238, 246 (5th Cir. 2021) (per curiam) (quoting *Bolton v. City of Dall.*, 541 F.3d 545, 548-49 (5th Cir. 2008)); *see, e.g.*, *Sweetin v. City of Tex. City, Tex.*, 48 F.4th 387, 393 (5th Cir. 2022) ("[T]he fact that Wylie is 'responsible for the everyday operations of the EMS Department' is immaterial because such a responsibility only indicates decision-making authority rather than policymaking authority." (collecting cases)).

Instead, "[a] true policymaker must 'decide the goals for a particular city function and devise the means of achieving those goals.'" *Webb v. Twn. of Saint Joseph*, 925 F.3d 209, 217 (5th Cir. 2019) (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984)). In that respect, "[a] 'policymaker' must be one who takes the place of the governing body in a designated area of city administration." *Webster*, 735 F.2d at 841 (quoting *Bennett*, 728 F.2d at 769).

Considering that "[a] municipal employee may also possess final policymaking authority where the final policymaker has delegated that authority, either expressly or impliedly," *Webb*, 925 F.3d at 215 (citing *Zarnow*, 614 F.3d at 167), where a plaintiff relies on an employee to allege the liability of the employing municipality, the complaint must at least include facts from which the Court may infer that final policymaking authority has been so delegated, a common situation being (the one here) from a city council to its police chief.

> As illustrated in a pre-*Groden* decision from this district, in a suit against the City of Dallas, sufficient factual allegations connecting an allegedly unconstitutional policy to the City's actual policymaker, its City Council, can insulate a complaint from dismissal under Rule 12(b)(6) even if municipal liability is based on actions by the City's police chief. *See Flanagan v. City of Dallas, Tex.*, 48 F. Supp. 3d 941, 950-52 (N.D. Tex. 2014). In *Flanagan*, the plaintiffs alleged "in their amended complaint ... that Dallas City Councilman Dwaine Caraway recently confirmed that the City Council had delegated policy-making authority for police officer training to Chief Brown." *Id.* at 951. … Here, Hughes's amended complaint lacks similar factual allegations to show that it is plausible that Chief Brown was a final policymaker, notably under a theory that he was acting under policymaking – not decisionmaking – authority delegated to him.

*Hughes v. City of Dall., Tex.*, No. 3:18-cv-1770-B, 2020 WL 4670659, at *4 (N.D. Tex. Aug. 11, 2020).

And, like the amended complaint in *Hughes*, the SAC lacks factual matter from which the Court may infer that final policymaking authority was delegated to the Chief of Police, expressly or impliedly.

Nonetheless, Mason offers an alternative: "Plaintiff also alleges that she alerted the Mayor and the City Council as to the wrongdoing of the police without result or redress. Thus, even if this Court does not deem the Chief of Police a relevant policymaker, Plaintiff has adequately alleged that the Mayor and the City Council ratified the widespread practices of the Mansfield police." Dkt. No. 41 at 19 (citation omitted).

But this alternative "does not correctly reflect ratification in the context of municipal liability. Simply not repudiating [police conduct] does not mean that a policymaker ratifies it. If so, that would cross the line into impermissible respondeat superior liability for a municipality." *Dobbins v. City of Dall.*, No. 3:20-cv-1727-K,

2021 WL 3781927, at *2 (N.D. Tex. Aug. 25, 2021). And, as explained above, "the Fifth Circuit has limited the theory of ratification to 'extreme factual situations,' such as officers' killing of the innocent occupant of a truck or their shooting of a fleeing suspect in the back." *Id.* (cleaned up). No similarly "extreme factual situations" are alleged here. *Cf. Winzer v. Kaufman Cnty.*, No. 3:15-cv-1284-N, 2023 WL 2530861, at *7 (N.D. Tex. Mar. 14, 2023) ("The 'extreme factual scenario' exception permitting ratification liability has an 'extremely high' bar. Accordingly, it 'has not enjoyed wide application in this Circuit.'" (citations omitted)).

In sum, Mason has not plausibly alleged liability against the City, the sole defendant. And the detailed factual allegations of the SAC, prepared and filed by counsel, reflect that she has now pled her best case. So the Court should dismiss this lawsuit with prejudice.

**Recommendation**

The Court should grant Defendant City of Mansfield's motion to dismiss the second amended complaint [Dkt. No. 40] and enter judgment dismissing this action with prejudice.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and

specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: May 3, 2023

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE